IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COOPER LIGHTING, LLC,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>CORDELIA LIGHTING, INC.,<br><br>　　　　　and<br><br>JIMWAY, INC.<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)　Civil Action No. 1:16-cv-02669-MHC<br>)<br>)<br>)<br>)<br>)<br>) |

## **DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

Counsel for Defendants

/s/ Seth K. Trimble
Lester J. Savit (*pro hac vice*)
lsavit@onellp.com
Paul Y. Feng (*pro hac vice*)
pfeng@onellp.com
Stephen M. Lobbin (*pro hac vice*)
slobbin@onellp.com
John E. Lord (*pro hac vice*)
jlord@onellp.com
ONE LLP
4000 MacArthur Boulevard
East Tower, Suite 500
Newport Beach, CA 92660
Phone:  (949) 502-2870

Coby S. Nixon (GA Bar No. 545005)
cnixon@taylorenglish.com
Seth K. Trimble (GA Bar No. 851055)
strimble@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
Phone:  (770) 434-6868
Facsimile:  (770) 434-7376


*Attorneys for Defendants*
*Cordelia Lighting, Inc. and Jimway,*
*Inc.*

March 27, 2017

## **TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................1

II.  FACTUAL BACKGROUND ....................................................................2

III. DISPUTED CLAIM TERMS AND PHRASES..................................6

    A.  The Court Has An Obligation to Construe Disputed Terms ........................6

    B.  Terms in the Tickner Patents ('477 Patent, '479 Patent, '978 Patent)..........7
        1. "heat sink"....................................................................................7
        2. "coupled"....................................................................................10
        3. "LED package" ..........................................................................13
        4. "the two torsion springs are disposed proximal to an open end of the downlight module"....................................................................13
        5. "a substrate and at least one LED disposed on the substrate" ................15
        6. ..."an adapter including an Edison based connector at one end configured to be electrically coupled to an Edison based socket and connected to the driver at an opposing end" ..........................................................16
        7. "means for mounting the heat sink and LED light source within a recessed light fixture" .................................................................20
        8. "mounting devices/attachment mechanisms" .........................................23

    C.  Terms in the Davis Patents ('956 Patent)....................................................25
        1. "heat sink"..................................................................................25
        2. "planar" ......................................................................................27
        3. "slot" ..........................................................................................28
        4. "the trim ring and heat sink are integrally formed as a single component" ...................................................................................29

IV.  CONCLUSION ........................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.,*
    214 F.3d 1302 (Fed. Cir. 2000) .............................................................17

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
    815 F.3d 1314 (Fed. Cir. 2016) ................................................. 7, 13, 27

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464 (Fed. Cir. 1990) ......9

*Human Genome Scis., Inc. v. Genentech, Inc.*, 589 F.Supp. 512 (D. Del. 2008)....19

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed. Cir. 1995)...................7

*Mas Hamilton Grp., Inc. v. LaGard, Inc.*, 156 F3d 1206 (Fed. Cir. 1998) .............25

*Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344 (Fed. Cir. 2006) ..............25

*Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075 (Fed. Cir. 2009).......................9

*Personalized Media Commc'ns. LLC v. Int'l Trade Comm.*,
    161 F.3d 696 (Fed. Cir. 1998) ..................................................... 21, 24

*Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005) ........................................17

*Robinson v. Dalton*, 107 F.3d 1018 (3d. Cir. 1997) ................................................19

*Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420 (Fed. Cir. 1997)...............21

*Watts v. XL Sys., Inc.*, 232 F.3d 877 (Fed. Cir. 2000) ............................................24

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).......................23

**Statutes**

35 U.S.C. §112................................................................................. passim

## I.  __INTRODUCTION__

Plaintiff Cooper Lighting, LLC ("Cooper") asserts that Defendants Cordelia Lighting, Inc. and Jimway, Inc. (jointly "Cordelia") infringe four patents.[1]  The first three patents trace their heritage to a single patent application filed on September 22, 2008.  Each of those patents shares exactly the same abstract, drawings and written specification.  These patents (the '477 patent, the '479 patent and the '978 patent) will be referred to collectively as the "Tickner patents" and, for claim construction purposes, will be treated as a single disclosure with three sets of claims.[2]

The further asserted patent, the Davis patent, issued from a patent application that was filed March 15, 2011, years after the original Tickner patent application was filed and published.  The Joint Claim Construction Statement ("JCCS") lists 24 items under the "Term/Phrase" heading of Exhibit A.  In order to simplify and shorten the claim construction briefing, Cordelia has combined together duplicative terms appearing in different patents, reducing the number of disputes discussed below to an even dozen.

---

[1] U. S. Patent No. 8,348,477 (the '477 patent), Ex. A; U. S. Patent No. 8,348,479 (the '479 patent), Ex. B; U. S. Patent No. 8,789,978 (the '978 patent) Ex. C; and U. S. Patent Nos. 9,010,956 (the '956 patent or Davis patent), Ex. D.

[2] The original September, 2008, patent application issued as U.S. Patent No. 7,959,332 (the "'332 patent").  Cooper is not asserting infringement of this patent. The asserted Tickner patents were filed as "continuation patent applications" of the application that became the '332 patent.  Continuation patent applications contain the same written specification and drawings as the earlier applications, but seek examination and issuance of additional claims.

## II.   __FACTUAL BACKGROUND__

The Tickner patents are entitled, "Light Emitting Diode Recessed Light Fixture," and describe "an LED light fixture with an LED light source."  1:28-30.[3] "A recessed light fixture is a light fixture that is installed in a hollow opening in a ceiling or other surface."  1:40-41.

> Traditional recessed light fixtures include a lamp socket coupled to the plaster frame and/or the can fixture.  The lamp socket receives an incandescent lamp or compact fluorescent lamp ("CFL").  As is well known in the art, the traditional lamp screws into the lamp socket to complete an electrical connection between a power source and the lamp.

1:46-52.

The patent continues:  "The invention provides a recessed light fixture with an LED light source.  The light fixture includes a housing or 'can' within which an LED module is mounted."  2:6-8.  The claims of the asserted Tickner patents focus on the LED module and the structures used for mounting the module in an existing receptacle, housing or can.

Light generating LEDs are mounted on a substrate to create an "LED package 305."  5:40-41.  Although relatively small, "LED package" 305 "generates all or substantially all the light emitted by the recessed light fixture."  2:8-10.  The claims

---

[3] Citations are to the "column:line" of the '477 patent.  Due to printing discrepancies at the Patent Office, the citations to the same passages vary slightly among the three different Tickner patents.  In order to avoid confusion, Cordelia's citations to the columns and lines of the Tickner patents herein are to the '477 patent unless otherwise noted.

are directed to a number of structural elements including (1) a heat sink, (2) an LED,

(3) a reflector housing, (4) a bracket, (5) torsion springs, (6) a mounting bracket, and

(7) a driver.  The components of the module and their relationship to each other are

best understood by reference to the exploded view provided as Figure 8.

**'477 Patent Fig. 8, with annotations**



The LED package 305 is mounted to the flat bottom surface 310*a* of "heat sink

310."  5:34-35; 7:1-13.  A reflector housing 320 is also attached to the bottom surface

310a of the heat sink 310.  The LED module also includes a bracket 325 that is attached to the heat sink 310.  9:21-25.  Torsion springs 340 are attached to the bracket 325.  9:16-17.  The torsion springs are one of the components used for mounting the series of connected components, called the LED module, in the empty can.  10:54-60.

A mounting bracket 335 is attached to the top of bracket 325.  9:36-40.  A driver 315 is in turn attached to the mounting bracket.  9:56-58.  The driver 315 provides electrical power and control to the LED package.  9:60-62. Electricity is brought to the module's driver 315 by an "Edison adapter" 1520 shown in Figure 15, reproduced below.  10:33-38.

**'477 Patent Fig. 15, with annotations**



The Edison adapter includes wires 1520*a* that connect screw-in plug 1520*b* to

4

a connector 1520*c*.  10:67-11:6.   The Edison base adapter 1520 electrically couples the driver 315 of the LED module 300 to the power source of the existing fixture via socket 1505 (shown in Fig. 15).   The Edison adapter allows an electrical connection to be made between the Edison socket, which is typically attached inside the can in the ceiling, and the LED module, which is being inserted up into the ceiling, in two steps.  10:27-43.   The first step is the connection of the screw-in-plug to the Edison socket.  *Id.*   The second step is the connection of the connector to the module.  *Id*. As shown in Fig. 15, the driver is adjacent to the plug.

The Davis patent is entitled, "LED Module With On-Board Reflector-Baffle-Trim Ring."   The Davis patent purportedly addresses the problem of conventional LED modules that are, for example, "designed to fit within a housing having a six inch nominal diameter opening, while a different conventional LED module is designed to fit within a different housing having a five inch nominal diameter opening."  '956 patent, 1:51-55.   The solution provides a heat sink 110 containing a series of mounting pads, each of which has a series of holes to allow adjustment of a single module to either a five-inch and six inch diameter.  *See* '956 patent, 4:5-10, 11:7-15 and Fig. 4.  Widthwise adjustment of the torsion springs 163 (which engages the inside of the can) relative to the heat sink is provided by a mounting bracket 162 (shown in Fig. 3 reproduced below).[4]  *See* 11:33-39.

---

[4] The "mounting bracket" 162 of the Davis patent is an entirely different component

**'956 Patent Fig. 3, with annotations**



The mounting bracket 162 includes a first portion 310, a second portion 320, and a tab 330.  12:27-28.  The first portion and the second portion are substantially planar.  12:31-32.  The first portion 310 includes a slot 316 that extends longitudinally along the first portion 310.  12:35-36.  The mounting bracket is held to the mounting pad by the coupling device 206 (such as a screw[5]).  *See* '956 patent, 11:7-15; Fig. 2.

### III.  DISPUTED CLAIM TERMS AND PHRASES.

### A. The Court Has An Obligation to Construe Disputed Terms

In the JCCS[6], Cooper asserts that more than half of the listed items do not need to be construed.  However, the United States Court of Appeals for the Federal

---

from the "mounting bracket" 335 of the Tickner patents.
[5] '956 patent, 9:53.
[6] The Joint Claim Construction Statement, March 3, 2017, Docket # 36.

Circuit, the appellate court for all patent cases in the United States, recognized an affirmative obligation on the district court to make the legal determination of the construction of a disputed term.

> In *O2 Micro*, this court held that "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  521 F.3d 1362.  This duty resides with the court because, of course, "the ultimate question of construction [is] a legal question."  *Teva*, 135 S.Ct. at 842; *see also O2 Micro*, 521 F.3d at 1360 ("[T]he court, not the jury must resolve that dispute." (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)) (en banc) aff'd 517 U.S. 370 (1996)).  ***Thus, "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."***  *O2 Micro*, 521 F.3d at 1361.

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) (emphasis added).  Thus, failing to construe a claim term or phrase whose meaning is disputed, especially a term or phrase having more than one ordinary meaning, improperly leaves the legal determination of claim construction to the jury.

### B. Terms in the Tickner Patents ('477 Patent, '479 Patent, '978 Patent)

#### 1.  "heat sink"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
| --- | --- |
| No construction or "structure that transfers heat from the light source" | "a metallic heat exchanger with high thermal conductivity for transferring heat away from the LED package and radiating it to the environment" |

The Tickner patents describe an LED module that can be installed in an

existing recessed light fixture, otherwise known as a downlight.  Fig. 8 shows the relationship of the heat sink to the other components of the module.  It is attached to the LED package 305 and reflector housing 320 on one side.  Its sides are attached to bracket 325, that is in turn attached to the mounting bracket 335 that holds the driver 315.  The heat sink component is mentioned at least 39 times in the specification, and is a limitation in every claim of the Tickner and Davis patents.  It an essential part of the subject matter of the patents.

Cordelia's proposed construction flows naturally from the teachings of the specification, including express statements that the heat sink be made of a heat conductive material, such as metal.  *See* 6:55-65.  It is also consistent with the applicable dictionary definitions of "heat sink":  "a thermal conductive metal device designed to absorb and disperse heat away from a high temperature object such as a computer processor."  Technopedia.com, Ex. E.  Thermal conductivity is further explained as "[h]eat transfer occurs at a lower rate across materials of low thermal conductivity than across materials of high thermal conductivity.  Correspondingly, materials of high thermal conductivity are widely used in heat sink applications…."  Wikipedia, Ex. F

Cooper's proposed construction fails because it transforms the "heat sink" structural feature into a functional one.  Patent claim elements can be expressed in structural terms or in functional terms; "heat sink" is clearly a structural term and

not a functional term.  It would be legal error to construe it as a functional term.

> Construing a non-functional term in an apparatus claim in a way that makes direct infringement turn on the use to which an accused apparatus is later put confuses rather than clarifies, frustrates the ability of both the patentee and potential infringers to ascertain the propriety of the particular activities, and is inconsistent with the notice function central to the patent system."

*Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075, 1091 (Fed. Cir. 2009) ("Apparatus claims cover what a device is, not what a device does." *Id*. at 1090, citing *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990)).

Cooper's functional construction of "heat sink" as anything that transfers heat from the light source lacks any structural limitations and would encompass any structural element that performs the same function of transferring heat from the light source.  The primary source of the heat in the module is the LEDs.  As other elements in addition to the "heat sink" are exposed to the LEDs, they also would be exposed to radiating heat and necessarily act to transfer heat away from the light source.  For example, the substrate upon which the LEDs are mounted would be exposed to heat generated by the LEDs and presumably transfer at least some thermal energy from the LEDs.  However, the specification makes clear that the "heat sink" is something entirely different from the "substrate."  Cooper's proposed functional construction would not distinguish the "heat sink" from the "substrate" or other components.

Further, Cooper's construction is improperly vague and broad by any

standard.  It states that it transfers heat from something, the light source, but does not state to where the heat is transferred.  The patent clearly states that the heat sink transfers heat to the "surrounding environment (typically air in the can 115 of the light fixture 100) via convection."  7:51-53. Hence, even if the Court was to adopt an improper functional construction for a structural feature, Cooper's proposal still should be rejected as improperly vague.  Cordelia's structural construction is correct and should be adopted by the Court.

## 2.  "coupled"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
|---|---|
| "directly or indirectly mounted" | "directly attached thereto" |

The term "coupled" is ubiquitous in the Tickner patents; it is not used to describe a particular relationship between particular components.  On the contrary, the patent attorney used it to mean "directly attached to" for at least ten different structural connections:

- LED package is described as "coupled" to a heat sink.[7]  As shown in Fig. 8, the LED package 305 is directly attached to the heat sink 310.

- Reflector housing is "coupled" to the heat sink.[8]  As shown in Fig. 8, the reflector housing 320 is directly attached to heat sink 310.

---

[7] Abstract, 2:19, Fig. 8, ('477 patent, claim 1) 14:12, ('477 patent, claim 13) 14:65, ('477 patent, claim 18) 15:29, ('477 patent, claim 19) 16:15, ('479 patent, claim 1) '479 patent, 14:4, ('479 patent, claim 6) '479 patent, 14:38, ('978 patent, claim 1) '978 patent 14:18-19.

[8] Abstract, 2:39-40, 7:63-64, Fig. 8, ('479 patent, claim 6) '479 patent 14:46, ('978 patent, claim 9) '978 patent 14:62-63 (housing is "coupled" to the lower surface of the heat sink), ('978 patent, claim 17) '978 patent 16:20.

- Optic coupler is "coupled" to the reflector housing.[9]  As shown in Fig. 8, the optic coupler 330 is directly attached to the reflector housing 320.  (*See also* Fig. 11 showing holes in reflector housing for direct attachment.)

- Each LED is "coupled" to the substrate.[10]  As shown in Fig. 8, the LEDs are mounted to a common substrate 306.  5:39-40.

- Edison base adapter and at least a portion of the wires are "coupled" together.[11]  As shown in Fig. 16, the Edison adapter 1520 has wires 1520a directly attached.

- Bracket 325 is "coupled" to the heat sink.[12]  As shown in Fig. 8, bracket 325 is directly attached to heat sink 310 by rivet 325*d*.

- Mounting bracket is "coupled" to the downlight module.[13]  As shown in Fig. 15, the mounting bracket 335 is directly attached to the LED module 300.

- Torsion springs are "coupled" to an exterior surface of the downlight module.[14]  As shown in Fig. 12, the torsion springs are attached to an exterior surface of the downlight module.

- Bracket is "coupled" to the downlight module.[15]  As shown in Fig. 8, bracket 325 is directly attached to the downlight module 300.

---

[9] Abstract, 2:59.

[10] 2:12-13, ('978 patent, claim 7) 14:53-54 (LED light source is "coupled" to the common substrate), ('978 patent, claim 14) '978 patent 15:21, ('978 patent, claim 19) 16:25 (one LED is coupled to a common substrate).

[11] 3:27-28.

[12] 9:21-22.

[13] '477 patent, claim 15) 15:19-20, 9:36-37 (mounting bracket 335 is "coupled" to the top member 325a and or the top end of the heat sink), ('479 patent, claim 8) '479 patent, 14:59 (mounting bracket "coupled" to the downlight module.

[14] '477 patent, claim 1 14:18-19; '978 patent, claim 1, 14:24-25.

[15] '477 patent, claim 7, 14:41-42; '477 patent, claim 13, 15:4-5; '479 patent, claim 4; '479 patent, 14:28-29; '978 patent, claim 4, 14:43-44; '978 patent, claim 13, '978 patent 15:19.

- Mounting devices are "coupled" to an external surface of the downlight module.[16]  As shown in Fig. 8, the mounting devices, including the bracket 325, mounting bracket 335, two torsion springs 340, and two rivets 325d, are directly attached to the LED module 300.

The dictionary definition of "coupled" is consistent with the specification's use of the term.  It defines "coupled" as: "to join, fasten, esp. in pairs; to connect together, pair; to bring together, pair off …."  Ex. G.  In the different uses of the term "coupled" cited above, the clear relationship of the components was that they were joined **directly** together.

Cooper's proposed construction fails as improperly vague and broad.  By including "indirect" mounting within the construction, the meaning of the term "coupled" is completely undone.  As demonstrated above, in the Tickner patents "coupled" describes the very close physical relationship of two components as being directly attached.   Cooper's proposal, on the other hand, would include that relationship, but also include components that clearly are not closely related.  For example, as shown in Fig. 8, the driver 315 at the top right of the drawing would be "coupled" to reflector housing 320, shown at the bottom left of Fig. 8 because it would be "indirectly attached" thereto.  The term "coupled" was not meant to be so all encompassing.  Cooper's too broad construction should be rejected in favor of Cordelia's proposal.

---

[16] '978 patent, claim 9, 14:64-65.

### 3. "LED package"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
|---|---|
| No construction | "one or more LEDs mounted to a substrate" |

Cordelia's proposed construction of "LED package" is found in the specification: "[T]he LED package can include one or more LEDs mounted to a common substrate. Each LED is an LED die or LED element that is configured to be coupled to the substrate." 2:11-13. Cooper provides no reason why a definition found in Cooper's own patents should not be adopted by the Court.

Construing the term "LED package" is important to the jury's understanding of the similar sounding terms containing "LED"[17], and the validity issues to be decided in this case. Cooper refuses to agree to that construction, but proposes no alternative. Instead it seeks to leave the jury adrift in a sea of "LED" terms. To do so would improperly submit the legal determination of the meaning of the term to the jury. *Eon Corp.*, supra.

### 4. "the two torsion springs are disposed proximal to an open end of the downlight module"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
|---|---|
| No construction or "the two torsion springs are mounted near the end of the module from which light is projected" | "the two torsion springs are located very close to the end of the module from which light is projected." |

---

[17] Just in the Abstract and the first two paragraphs alone, the Tickner patents include the terms "LEDs" (Abstract), "LED module" (Abstract), "LED package" (Abstract), "LED light sources" (2:1), "LED die" (2:12), and "LED element" (2:13).

The dispute here relates to the location of the torsion springs relative to the end of the module that emits light.  Cooper acknowledges that the torsion springs are located "near" the end of the module, while Cordelia contends that the proper construction is that they are "very close" to the end of the module.  The word "proximal" does not appear in the specification at all, only the claims.  However, the issue is resolved by looking to the patent drawings and the reason for placing the springs in a particular position on the module – to assure that the trim ring is flush against the ceiling.

"The trim ring 1305 provides an ***aesthetically pleasing frame*** for the lighting fixture 100."  9:5-6 (emphasis added), Figs. 12-13.  In particular, when the reflector 1205 and trim ring 1305 are installed in the light fixture 100, at least a portion of a bottom end 1205*b* of the reflector 1205 rests on a top surface 1305*b* of the trim ring 1305."  9:12-15.  In other words, a person looking up at the downlight will see the trim ring pulled tight against the ceiling by the torsion spring.[18]  The guts of the module, including the spring itself, are not visible because the torsion spring pulls them up and into the receptacle, hidden behind the light source, reflector and trim ring.

---

[18] "The trim ring typically is separably coupled to the heat sink or to a portion of the housing, generally by use of torsion springs, and is positioned so that at least a portion of the trim ring extends below the support structure and covers the space formed between the lower exterior portion of the housing and the support structure when viewed from an area below the support structure."  '956 patent, 1:64-2:3.

The torsion spring is not visible only because the gap between the torsion spring and the module end is very small. Figs. 12 and 13 show the distance between the torsion spring and the reflector bottom surface 320$ca$ and trim ring 1305 as small as possible. Otherwise, a gap between the spring and the end of the module would provide a visible space between the reflector bottom surface 320$ca$. Hence, the term "proximal" refers to the fact that the torsion spring must be located not just near, but very close to the module end from which light is emitted.

### 5.  "a substrate and at least one LED disposed on the substrate"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
| --- | --- |
| No construction or "a support layer made of one or more sheets of ceramic, metal, laminate, circuit board, mylar, or another material" | "one or more LEDs mounted on one or more sheets of ceramic, metal, laminate, circuit board, mylar, or another material" |

The parties appear to agree that the second clause of this phrase, "at least one LED," means "one or more LEDs." The parties also appear to agree that "a substrate" is made of "one or more sheets of ceramic, metal, laminate, circuit board, mylar, or another material." This construction is found ***verbatim*** in the specification at 5:40-42.

The sole dispute is created by Cooper's attempt to limit the function of the "substrate" to acting as a "support layer." According to the specification, the function is not so limited. For example, the Tickner patents point out that the substrate acts as a "circuit board." 5:42. A circuit board provides electrical

connections, a function not included within the scope Cooper's proposed construction of "substrate" as a "support layer."

Indeed, the focus of the substrate in the specification is on the circuitry function, not as a support. It talks about "the sizes and locations of the electrical connections at the substrate…." 3:2-4. Similarly, the specification states, "[t]he substrate 306 is electrically connected to the support circuitry…." 6:46-47. "[O]ne or more wires (not shown) can couple opposite ends of the substrate 306 to the driver 315, thereby completing a circuit between the driver 315, substrate 306, and LEDs." 6:49-51. Cooper's proposed construction should be rejected as improperly limiting the function of the substrate to be a "support layer." Cordelia's proposed construction is more accurate and inclusive construction should be adopted.

### 6. "an adapter including an Edison based connector at one end configured to be electrically coupled to an Edison based socket and connected to the driver at an opposing end"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
|---|---|
| "a device for electrically connecting the driver of the downlight module to an existing power source, the device having a plug at one end, for mating with an Edison socket, wired to a connector at the other end, for mating with the driver" | Cooper's proposed construction for this lengthy series of phrases is an improper rewriting of the claim. However, the following two phrases should be construed as follows: |
| "an Edison based connector" does not need a separate construction from the limitation set forth above. | "an Edison based connector" should be construed as "a screw-in-plug" |

| "electrically coupled" should not be construed at all or should be construed as "connected electrically" | "electrically coupled" should be construed as "communicating electricity" " |
|---|---|

The Tickner patents describe an "Edison adapter."  There is no dispute that the preferred embodiment of the Edison adapter is shown in Figs. 15 and 16.  The preferred embodiment includes a screw-in plug at one end, similar to that found on an electric, incandescent light bulb, for connection to a power source.  The other end is connected to the driver.

As an initial matter, Cooper's proposed construction should be rejected as an improper rewriting of a substantial portion of the claim in entirely new language. Instead of proposing a claim construction that clarifies a word or phrase in the context of the patent, Cooper proposes that the entire 29-word stanza directed to the adapter feature be replaced with a new, even longer 43-word string.  Cooper's proposal should be rejected on that basis alone.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005), citing *Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.,* 214 F.3d 1302, 1309 (Fed. Cir. 2000) ("[H]aving concluded that the amended claim is susceptible of only one reasonable construction, we cannot construe the claim differently from its plain meaning in order to preserve its validity.")

During the claim construction procedure leading up to the filing of the JCCS, the parties exchanged preliminary proposed constructions pursuant to Patent L.R. 6.2 and the scheduling order.  Cooper's preliminary proposed construction for this

phrase was "plain meaning; no construction necessary." Ex. H at 7.[19] Hence, Cooper should be barred from now proffering a lengthy, 43-word construction for this phrase.

Even if the Court were to consider this newly proposed construction, Cooper's extensive rewrite of the claim should also be rejected because it includes additional limitations not found in the claim. The claim language states that one end is an Edison based connector and the other end is connected to the driver. The claim does not address how the two ends are structurally connected to each other. Cooper's proposal, however, injects a new limitation - that the "plug" at one end is "wired" to a connector at the other end.

The preferred embodiments of Fig. 15 and 16 show an adapter with two ends connected by a wire, the claim is not so limited. The claim merely recites the structures of the two ends. The structure of the connection between the two ends is not recited or otherwise limited. Indeed, Fig. 15 shows the driver adjacent the screw-in-plug and connector, and the claim does not exclude from its scope the driver being located between the two ends.

Indeed, it is apparent that Cooper purposefully did not want to limit the claim to include the wire. It was seeking to obtain a claim that was broad enough to ensnare

---

[19] Cooper Lighting, LLC's Preliminary Proposed Constructions And Identification of Extrinsic Evidence, served February 6, 2017.

an arrangement in which the screw-in-plug and the driver are solidly connected – the arrangement attached hereto as Ex. I. Cooper should not be allowed now to rewrite the claim to insert a new limitation to save its validity.

In addition, there are strong procedural and equitable reasons why Cooper should not be allowed to rewrite this claim. Just prior to the issuance of the Tickner '978 patent, Cooper filed another continuation patent application containing the same specification as the Tickner patents.[20] That patent application is still pending.[21] As a result, Cooper continues to have the opportunity to submit new language to the Patent Office for administrative review. If Cooper wants to obtain new claims with new language for the Edison adapter that recites a wire connection between the ends, it should do so before the Patent Office, the administrative agency charged with reviewing claim language. For the Court to allow entirely new claim language to be substituted in issued Tickner patents would be not only inequitable, but contrary to proper administrative procedure requiring the exhaustion of administrative remedies. A plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief. *Human Genome Scis., Inc. v. Genentech, Inc.*, 589 F.Supp. 512, 519 (D. Del. 2008), citing *Robinson v. Dalton*, 107 F.3d 1018, 1020-21 (3d. Cir. 1997).

---

[20] Serial No. 14/569,896, filed December 15, 2014, attached as Ex. J.
[21] *See* current status of Serial No. 14/569,896 on the United States Patent Office Public Portal internet website.

In addition to objecting to Cooper's proposal, Cordelia proposes that the term "Edison based connector" be construed as "a screw-in-plug."  In its long proposal, the "Edison based connector" is translated as merely "a plug."  However, this is too broad.  The claim language at issue refers to the *Edison* based connector being adapted to mate with an *Edison* socket.  The specification refers to the connector as a "*Edison* screw-in plug" (3:21, 11:1-2, emphasis added) and shows it as such in Figs. 15 and 16 (item 1520*b*).  The male "*Edison* based connector" mates with the female *Edison* socket; it is by definition "a screw-in-plug."  Cordelia's construction should be adopted.[22]

### 7. "means for mounting the heat sink and LED light source within a recessed light fixture"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
|---|---|
| No construction because the phrase is not a means-plus-function term, or if it is, | Phrase is a means-plus-function term to be construed pursuant to 35 U.S.C. §112 (6) |
| Function:  "mounting the heat sink and LED light source within a recessed light fixture" | Function:  "to mount the heat sink and LED light source within a recessed light fixture" |
| Structure:  "torsion springs" | Structure:  "bracket 325, mounting bracket 335, two torsion springs 340, two rivets 325*d*" |

---

[22] The construction of the phrase "electrically coupled" is technically disputed, even though there is essentially no difference between the two proposals.  Cordelia has no objection to the adoption of Cooper's proposal of "connected electrically."

The initial dispute over the phrase "means for mounting …" is whether or not it is a means-plus-function phrase to be construed pursuant to 35 U.S.C. §112 (6).[23] Cordelia contends that it is such a phrase.  Cooper asserts that it is not.

A patent attorney writes a means-plus-function phrase to express a feature as a "means" for performing an identified function.  *Id*  Here, Cooper's patent attorney used the magic words and format provided under the statute to signal that the phrase should be interpreted as means-plus-function.  The word "means" appears in the clause.  It is followed by a function – "for mounting the heat sink and LED light source within a recessed light."  "[U]se of the word 'means' triggers a presumption that the inventor used this term advisedly to invoke the statutory mandates for means-plus-function clauses."  *Personalized Media Commc'ns. LLC v. Int'l Trade Comm.*, 161 F.3d 696, 704 (Fed. Cir. 1998).

The presumption of a "means-plus-function" phrase by the presence of "means" in a claim is not conclusive.  A claim that recites a function, but goes on to elaborate sufficient structure, material or acts within the claim itself to perform entirely the recited function, is not a means-plus-function format.  *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427-28 (Fed. Cir. 1997) Here, the "means for

---

[23] The provision states:  "An element in a claim may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

mounting" phrase appears in claim 13 of the '479 patent (15:10-11) without reciting any structure.  Hence, Cooper cannot overcome the presumption that the phrase should be construed according to 35 U.S.C. §112 (6).

Other claims at issue here, for example, '477 patent, claim 18 (16:8-12), recite part of the structure disclosed in the specification for performing the function.  It states:  "wherein the means for mounting … comprises ***at least*** two torsion springs located on opposite side surfaces of the downlight module proximal to open end of the downlight module."  (16:8-12, emphasis added.)  The "***at least***" language literally calls out that the "means for mounting" includes structure in addition to the two torsion springs.

The "at least" language in the claim is consistent with the specification, which identifies the mounting function to be accomplished by the torsion springs, ***and*** the bracket 325, mounting bracket 335 and rivets 325*d*.  "[A] bracket 325 couples torsion springs 340 to opposite sides surfaces 310*f* of the heat sink."  9:16-7.  Each side of the bracket 325 "includes an aperture 325*c* configured to receive a rivet 325*d* for other fastening device for mounting one of the torsion springs 340 to the heat sink 310."  9:26-28.

A mounting bracket 335 is coupled to the top member of the bracket 325, it has a profile that corresponds to the interior of the interior of the can 115.  *See* 9:36-46.  This creates a "junction box" in the can when the LED module is installed.  9:44-

49.  Hence, all of these structures are specified in the Tickner patents for performing the function of mounting the heat sink and light source in the recessed light fixture. As none of the claims containing the phrase "means for mounting …" recite all the structure needed to perform the mounting function, "means for mounting" should be construed according to 35 U.S.C. §112 (6) in all the claims in which the phrase appears.

Construing means-plus-function claim terms follows a two step process. First, the claimed function must be identified, and then any structure disclosed in the specification corresponding to the claim function must be determined.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015) Here there is no dispute as to the function of the "means" – it is for mounting the heat sink and light source in the can.   As stated above, contrary to Cooper's position, the structure for performing the mounting function is not limited to torsion springs in isolation.  The structure also includes bracket 325, mounting bracket 335 and rivets 325*d*.  The phrase "means for mounting …" should be construed accordingly.

### 8.  "mounting devices/attachment mechanisms"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
|---|---|
| No construction because the phrase is not a means-plus-function term, or if it is, | Phrase is a means-plus-function term to be construed pursuant to 35 U.S.C. §112 (6) |
| Function:  none identified | Function:  "to mount the downlight module within a recessed light fixture" |

| Structure:  "torsion springs" | Structure:  "bracket 325, mounting bracket 335, two torsion springs 340, two rivets 325*d*" |
|---|---|

The parties agree that the terms "mounting devices" and "attachment mechanisms" should have the same construction, and that the proper construction should parallel "means for mounting" discussed above.  Means-plus-function format applies in some circumstances even in the absence of the word "means."  The failure to use the word "means" "creates a presumption that §112(6) does not apply, but the presumption is rebuttable if the evidence intrinsic to the patent and any relevant extrinsic evidence so warrant.  *Personalized Media Comms., Inc.*, supra, 161 F.3d at 703-04.   The presence of a "means-plus-function" phrase is demonstrated by "showing that the claim element recited a function without reciting sufficient structure for performing the function.  *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000), quoting from *Personalized Media*, supra.   Both these phrases recite a function.

Here, there are two strong indicators that the terms "mounting devices" and "attachment mechanisms" are to be construed as means-plus-function.  First, the first word of the two-word terms are recite a function – to mount or to attach.  Second, the remaining words in the two phrases - "devices" and "mechanisms" -are generic fillers that do not recite any structure for accomplishing the mounting or attaching function.  *Mas Hamilton Grp., Inc. v. LaGard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir.

1998), (The term "lever moving element" had no "generally understood structural meaning in the art."). The term "mechanism" "connotes no more structure than the term 'means'." *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006), (held: "colorant selection mechanism" is a means-plus-function term). The phrases viewed in their totality leave little doubt of their status as means-plus-function. They are nothing more than a functional word combined with a generic place-holder equivalent to "means". No additional structure for mounting appears later in the claim. Hence, the phrases should be construed as means-plus-function terms, and the appropriate structure for the mounting/attachment function is bracket 325, mounting, bracket 335, two torsion springs 340, two rivets 325*d*.

### C. Terms in the Davis Patents ('956 Patent)

#### 1. "heat sink"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
|---|---|
| No construction or "structure that transfers heat from the light source" | "a metallic heat exchanger with high thermal conductivity for transferring heat away from the LED package and radiating it to the environment." |

The parties agree that the construction of "heat sink" is the same in the Davis patent as proposed above for the Tickner patents, for essentially the same reasons. Cordelia's proposed construction for "heat sink" is fully supported in the specification of the Davis patent. "The heat sink 110 is fabricated using a thermally conductive, rigid material, such as a polymer, metal, or metal alloy. One example

… is aluminum." '956 patent, 7:3-6.  The Davis patent provides additional support for Cordelia's structural construction as opposed to Cooper's solely functional one.

Both the Tickner and Davis specifications set forth "heat sink" and "trim ring" components.[24]  Because of the two year gap between publication of the Tickner specification and the filing of the Davis patent, the disclosure found in Tickner is prior art to Davis.  Indeed, the Davis Background section specifically points out that the prior art "[c]onventional LED-based recessed luminaires can also include a trim ring."  Davis patent, 1:61-62.  This clearly refers to the arrangement shown in the Tickner patents.  Davis further describes this prior art heat sink and trim ring as being "thermally coupled."  2:3-4.

The Davis patent is critical of the Tickner prior art thermal coupling - "the amount of heat removal … is limited because the area of direct contact between the trim ring and the heat sink is reduced."  2:6-9.  One of the purported advantages of the Davis "invention" is accomplished by "integrally form[ing]" the trim ring with the second portion 121 of the heat sink 110.  6:50-53.  As a result, "heat transfer from the second portion 121 to the trim ring 140 is improved…."  6:53-54.  "[A]t least a portion of the heat generated from the LED packages 250 (FIG. 2) is released … to the trim ring 140…."  8:49-54.  Indeed, the Davis patent points out that the

---

[24] In Tickner, "heat sink" is item 310 and "trim ring" is item 1305 (*see* Fig. 13).  In Davis, "heat sink" is item 110 and "trim ring" is item 140.

trim ring "transfers heat from the light source," even better than the arrangement in the Tickner patents.  *Id*.  Adoption of Cooper's proposed functional construction of "heat sink" leads to the impossible conclusion that both the "heat sink" and the "trim ring" (along with other components) are both the "heat sink."  Hence, the Davis patent adds additional support for Cordelia's proposed construction of "heat sink" and rejection of Cooper's proposal.

### 2. "planar"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
| --- | --- |
| No construction | "flat" |

One of the dictionary definitions of "planar" is "flat."  Dictionary .com, Ex. K.  The Davis patent uses the word "planar" to mean "flat."  For example, the "mounting region 136" is described as "substantially planar."  5:47-49.  Figure 1C shows the mounting region as being flat.  The "first portion 310 of mounting bracket 162 is also described as being "substantially planar."  10:27-32.  The first portion 310 is shown in Figures 3 and 5 as being flat.  In addition, tab 330 is described as being "substantially planar."  10:59. Tab 330 is shown in Figure 3 as flat.  As the word "flat" does not appear in the Davis patent - the word "planar" was clearly used in its place.

Cooper asks the Court to allow the jury to decide the meaning of "planar."  As "planar" has more than one dictionary meaning, this is improper.  *See Eon Corp.*, supra.   Cooper does not suggest any other dictionary meaning as the appropriate

construction, it just refuses to agree to *any* construction.   This dispute is easily resolved by construing the term "planar" as "flat."

### 3.  "slot"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
|---|---|
| No construction or "a narrow opening" | "elongated opening with parallel sides and enclosed ends" |

Cordelia's proposed construction is consistent with both the dictionary definition of slot and the description of the "slot" in the Davis patent.   A dictionary definition of "slot" is "a narrow notch, groove, or opening, as a keyway in a piece of machinery, a slit for a coin in a vending machine, etc."   Webster's Unabridged Dictionary, Ex. L.   The Davis patent uses the word "slot" consistent with this dictionary definition.   "The first portion 310 [of the mounting bracket 162] includes a slot 316 that extends longitudinally along the first portion 310 and is positioned between the first end 312 and the second end 314."   10:35-37.   As shown in Figures 3 and 5, the slot is an elongated opening with parallel sides and enclosed ends, just as "slot" is described as an opening for a coin in a vending machine.

The function of the "slot" described in the Davis patent is also consistent with Cordelia's proposed construction.   "[T]he coupling device 206[25] is inserted through the slot 316 and into the coupling hole 454.   Thus, a portion of the coupling device 206 rests above the mounting bracket's first portion 310, while a portion of the

---

[25] This is a screw, for example.  *See* '956 patent, 9:53.

coupling device 206 is inserted and coupled within the coupling hole 454." 11:49-53.  Insertion of the "coupling device" (such as a screw) fixes the bracket in one of two possible positions on the mounting pad. To accomplish this function, the slot is merely an elongated aperture, which provides the option of inserting the coupling device 206 in multiple different positions, as opposed to a round aperture that provides only a single setting.  *See* 11:60-64 ("When moving the tab 330 from the second locating hole 453 to the first locating hole 452, the mounting bracket is moved closer to the interior portion 113 by sliding the coupling device 206 along the length of the slot 316.").

Cooper's proposed construction, "a narrow opening," is very vague – narrow relative to what?  An alleyway may be "narrow" to a driver of a car that is only inches narrower.  Obviously, that would not apply to the slot in the Davis patent. The context of the Davis patent supports a construction that "slot" means an elongated hole as proposed by Cordelia.

### 4.  "the trim ring and heat sink are integrally formed as a single component"

| Cooper's Proposed Construction | Cordelia's Proposed Construction |
| --- | --- |
| No construction | "the annular component that is positioned adjacent to and covers the ceiling opening and heat sink are made of a single piece of metallic material" |

The dispute surrounding this phrase focuses on the words "are integrally

formed as a single component." This phrase is inherently ambiguous. It could mean that the trim ring and heat sink are made of a single piece of metal. Alternatively, the phrase could mean that when the trim ring and heat sink are created, they are created as a single piece. Hence, it would be legal error to leave the construction of this phrase to the jury to decide at trial.

Cordelia's proposed construction recognizes that the claims in which this phrase appear are device claims, not method of manufacture claims. Further, the specification is focused on the purported advantage of the relationship of the trim ring and heat sink of the finished product, rather than any advantage to the manufacturing of the product. For example, the integral formation of the trim ring and heat sink provides for "[a]t least a portion of the heat from the heat sink 110 is released … to the trim ring…." 6:55-59. This purported benefit arises from the trim ring and heat sink existing as a single piece of metallic material, rather than the manner in which they are formed.

Cordelia also asks the Court to construe "trim ring" as "the annular component that is positioned adjacent to and covers the ceiling opening." As pointed out above, the trim ring 140 is an annular component as shown in Figures 1C and 2. "The trim ring is typically positioned just below the plane of the opening 127." 6:35-37. This is because "[o]nce the LED module 100 is installed into the housing, the bottom surface 142 of the trim ring 140 is oriented to face the desired illumination area and

is observable to one present within the desired illumination area.  Also, once the LED module is installed within the housing, the trim ring conceals the space formed around and between the lower exterior portion of the housing and the perimeter of the aperture formed within the support structure."  6:42-46.  Hence, "trim ring" should be construed as "the annular component that is adjacent to and covers the ceiling opening."

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the claim constructions proposed by Cordelia are correct and should be adopted by the Court.

Respectfully submitted this 27th day of March, 2017.

Counsel for Defendants

/s/ Seth K. Trimble
Lester J. Savit (*pro hac vice*)
lsavit@onellp.com
Paul Y. Feng (*pro hac vice*)
pfeng@onellp.com
Stephen M. Lobbin (*pro hac vice*)
slobbin@onellp.com
John E. Lord (*pro hac vice*)
jlord@onellp.com
ONE LLP
4000 MacArthur Boulevard
East Tower, Suite 500
Newport Beach, CA 92660
Phone:  (949) 502-2870

Coby S. Nixon (GA Bar No. 545005)
cnixon@taylorenglish.com

Seth K. Trimble (GA Bar No. 851055)
strimble@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
Phone:  (770) 434-6868
Facsimile:  (770) 434-7376

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, counsel certifies that the foregoing brief was prepared in Times New Roman, 14 point font, in compliance with Local Rule 5.1C.

<u>/s/ Seth K. Trimble</u>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, March 27, 2017, the foregoing DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record in this action.

<u>/s/ Seth K. Trimble</u>